JUDGE SWEET

KENT MARKUS
*Enforcement Director*
ANTHONY ALEXIS
*Deputy Enforcement Director for Field Litigation*
JEFFREY PAUL EHRLICH
*Assistant Litigation Deputy for Field Litigation*
STEFANIE ISSER GOLDBLATT
J.H. JENNIFER LEE
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (646) 495-5186
Facsimile: (646) 495-5189
Email: Stefanie.Goldblatt@cfpb.gov

13 CV 3064



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- x

CONSUMER FINANCIAL PROTECTION
BUREAU,

               Plaintiff,

          v.

MISSION SETTLEMENT AGENCY, d/b/a
MISSION ABSTRACT LLC, MICHAEL LEVITIS,
in his individual and official capacity, LAW
OFFICE OF MICHAEL LEVITIS, PREMIER
CONSULTING GROUP LLC, LAW OFFICE OF
MICHAEL LUPOLOVER,

              Defendants.

--------------------------------------------------------------- x

Case No. 1:13-cv-_____

**COMPLAINT**

     The Consumer Financial Protection Bureau (the Bureau) alleges the following against

Mission Settlement Agency, d/b/a Mission Abstract LLC (Mission), the Law Office of Michael

Levitis, Premier Consulting Group LLC (Premier), and the Law Office of Michael Lupolover

(together, the Corporate Defendants); and against Michael Levitis:

## INTRODUCTION

1.      The Bureau brings this action under sections 1031(a), 1036(a), 1054(a), and 1061 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a), 5564(a), 5581, and under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6102(c)(2), 6105(d), based on violations of the Telemarketing Sales Rule (TSR), 16 C.F.R. § 310 *et seq.*, in connection with the marketing and sale of debt-relief services and based on unfair and deceptive practices in violation of the CFPA, 12 U.S.C. §§ 5531, 5536.

## JURISDICTION AND VENUE

2.      This Court has subject-matter jurisdiction over this action because it is brought under a federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b), (c), and 12 U.S.C. § 5564(f).

## PARTIES

4.      The Bureau is an agency of the United States created by 12 U.S.C. § 5491(a). It has independent litigating authority, 12 U.S.C. § 5564(a), (b), including to enforce the TSR as it applies to persons covered by the CFPA, 15 U.S.C. §§ 6102(c)(2), 6105(d); 12 U.S.C. § 5531(a).

5.      Mission is a for-profit company that is located and does business in this district. Mission has used office space at 280 Madison Avenue, Suite 300, New York, NY 10017 and has offices at 2713 Coney Island Avenue, Brooklyn, NY 11235.

6.      The Law Office of Michael Levitis is a law firm located at 1729 E. 12th Street, Brooklyn, NY 11229. It does business in this district.

7.      Premier is a for-profit company with offices at 180 Sylvan Avenue, 2nd Floor,

Englewood Cliffs, NJ 07632 and 1130 Hooper Avenue, Toms River, NJ 08753. It does business in this district.

8.      The Law Office of Michael Lupolover is a law firm located at 180 Sylvan Avenue, 2nd Floor, Englewood Cliffs, NJ 07632. It does business in this district.

9.      Each Corporate Defendant engages in offering or providing a consumer financial product or service and is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(15)(A)(viii)(II), (6).

10.     Levitis is the principal of Mission and the Law Office of Michael Levitis, and is heavily involved in their day-to-day operations. He approved, ratified, endorsed, directed, controlled, managed, and otherwise materially participated in the conduct of their affairs. Levitis is a "related person" under the CFPA. 12 U.S.C. § 5481(25). Because of his status as a related person, Levitis is a "covered person" for purposes of the CFPA. *Id.* Levitis does business in this district.

## SUMMARY OF COMPLAINT

11.     Since at least September 2010, Defendants have marketed and sold debt-relief services to consumers. Defendants attracted financially distressed consumers through phone calls, mailings, and other solicitations promising substantial reductions in outstanding debts owed to unsecured creditors. In the course of offering their services, Defendants unlawfully collected fees in advance of providing any debt-relief services.

12.     In addition, since at least July 2011, Mission and Levitis committed deceptive and unfair acts and practices causing substantial financial injury to consumers. Specifically, they misled consumers, impersonated a government agency, and gave false statements regarding fees for Mission's debt-relief service. Instead of being applied towards repayment of consumers'

debts, a large percentage of the amounts that consumers paid into Mission's debt-relief services program went to Mission, which provided scant meaningful assistance to resolve consumers' debts and often left consumers in worse financial positions than before they enrolled.

## THE CORPORATE DEFENDANTS' BUSINESS PRACTICES

13.     The Corporate Defendants sold or offered to sell debt-relief services to consumers. In exchange for a fee, the Corporate Defendants promised to renegotiate, settle, reduce, or otherwise alter the terms of at least one debt between a consumer and one or more unsecured creditors or debt collectors in accordance with a settlement agreement or other contractual agreement executed by the consumer.

14.     The Corporate Defendants marketed their debt-relief services via the U.S. Mail, the Internet, and outbound or inbound telephone calls to or from consumers, including via at least more than one interstate telephone call.

15.     The Corporate Defendants requested or received enrollment fees, processing fees, debt-relief service fees, and other types of fees in advance of settling at least one of the consumer's debts.

16.     Each of the Corporate Defendants separately entered into a contract with a payment processor to receive services for the management, processing, and administration of payments. Under this contract, the payment processor managed the savings account (Dedicated Account) of each and every consumer who contracted for debt-relief services from each of the Corporate Defendants.

17.     When consumers signed up to receive debt-relief services through the Corporate Defendants' respective debt-relief programs, the Corporate Defendants directed consumers to sign up for the Dedicated Account with the payment processor. The Corporate Defendants also

instructed consumers to stop paying their creditors and instead to start making payments into the Dedicated Account managed by the payment processor.

18.    The Corporate Defendants represented to consumers that, if and when a consumer's Dedicated Account reached a sufficient balance, they would instruct the payment processor to transmit funds to a consumer's creditors to help satisfy the consumer's debts.

19.    At all times relevant to this Complaint, the Corporate Defendants required and relied on assistance from the payment processor to collect and disburse monies through the consumer's Dedicated Accounts.

20.    Consistent with the Corporate Defendants' direction, the payment processor: (i) withdrew funds from a consumer's bank account through ACH transfer and deposited them into the Dedicated Account, and (ii) transmitted funds from the Dedicated Account to itself and to the Corporate Defendants to cover processing and servicing fees, including the fee the Corporate Defendants charge to consumers for its debt-relief services. The transactions managed by the payment processor reflected that funds were routinely transferred out of a consumer's Dedicated Account to pay the Corporate Defendant's debt-relief fees before payments went to any creditors.

21.    With respect to Dedicated Accounts that were established on or after October 27, 2010, the effective date of the TSR's advance-fee ban, Mission and the Law Office of Michael Levitis collected fees from consumers in advance of settling the consumers' debts totaling approximately $1.1 million.

22.    With respect to Dedicated Accounts that were established on or after October 27, 2010, Premier collected fees from consumers in advance of settling the consumers' debts totaling approximately $187,830.

23.     With respect to Dedicated Accounts that were established on or after October 27, 2010, the Law Office of Michael Lupolover collected fees from consumers in advance of settling the consumers' debts totaling approximately $111,809.

## ADDITIONAL DEBT-RELIEF ACTIVITES OF MISSION

24.     At Levitis's direction, Mission impersonated a government agency to induce a higher volume of sales calls from consumers who incorrectly believed that Mission offered a government program. Mission routinely disseminated a written solicitation to consumers in an envelope bearing an image of the Great Seal of the United States for what Mission called the "Office of Disbursement." Mission circulated this solicitation in order to cause consumers to believe Mission was affiliated with a government program and to enhance Mission's ability to attract financially distressed consumers to receive debt-relief services. Mission's debt-relief service was in fact not affiliated with the government.

25.     Mission also misled consumers about the timing of fees for debt-relief services. Mission falsely asserted in the written solicitation that there were no "Upfront Fees" when in fact Mission charged them. Mission, at Levitis's direction, did not inform consumers that Mission charges advance fees, and otherwise concealed and misrepresented the size of Mission's fees.

26.     Mission, at Levitis's direction, also committed unfair acts and practices causing consumers substantial injury. Despite promising consumers that it would settle their unsecured debts for typically 55% of consumers' total outstanding credit-card balances, Mission often: (i) concealed the fact that creditors will not be paid by the time that consumers expect, or might not be paid at all; (ii) charged exorbitant debt-relief services fees often without settling any debts; and (iii) left consumers in worse financial positions than before they enrolled in Mission's program.

27.     Specifically, many consumers enrolled in Mission's program received zero or scant benefit in the form of settled debts and suffered net losses of approximately $1,300 to $3,000 per person. Consumers often learned from creditors that Mission had never contacted them. Unaware that this would occur, consumers had stopped communicating with and paying their creditors based on Mission's representation that it would handle consumers' debts on their behalf and based on Mission's instruction to cease communicating with the creditors and to cease paying these creditors directly. Because Mission did not often make negotiated payments to creditors as it promised it would, many consumers suffered additional financial injury in the form of credit-card penalties, higher interest rates, and adverse effects on their credit. Many consumers faced lawsuits commenced by their creditors or had to file for bankruptcy.

28.     By virtue of Mission's own conduct, the substantial injury that Mission caused was not reasonably avoidable by consumers: Mission systematically erected barriers to prevent consumers from obtaining information regarding the disadvantages of its debt-relief program. Whether Mission was originating new consumer accounts or working to maintain existing consumer accounts, Mission communicated with consumers in a manner that prevented consumers from learning of the debt-relief program's risks, costs, and conditions – the disclosures of which would have permitted consumers to ascertain the likelihood of consumer injury. For example:

    a.  At Levitis's direction, Mission staff enrolled as many consumers as possible regardless of whether consumers understood Mission's fee structure or other attributes of its debt-relief program.

    b.  Levitis directed Mission's staff to conceal the debt-relief services fees when enrolling new customers. If a consumer made specific inquiries

7

regarding fees, Levitis told staff to explain that the fee was embedded in the overall amount that consumers contributed on a monthly basis to their Dedicated Accounts so that Mission could obscure how much money accrued to pay off underlying debts versus went to Mission. If the consumer continued seeking more information, Levitis, at times, allowed the Mission employees to reveal the size of the fee (18%) but even then instructed them to withhold other information, including the timing of fees. Mission staff followed Levitis's instructions.

c.  Mission employees avoided answering consumers' questions about termination policies or the consequences of ineffective debt negotiations. Mission staff, at Levitis's direction, used deliberate obfuscation – by providing nonresponsive or misleading answers – to confuse consumers about the program's risks and costs. At other times, Mission staff dodged consumers' questions by assuring consumers that answers would be provided by more knowledgeable Mission employees during a later meeting with the consumers – despite knowing that no such meeting would occur.

d.  To retain the exorbitant fees paid into the program by consumers, Levitis instructed staff during periodic staff meetings not to issue refunds and to delay responding to consumers' refund requests until they ceased to be made.

e.  Before obtaining the consumer's consent to pay for the program, Mission failed to disclose the time by which it would make a *bona fide* settlement

8

offer to the consumer's creditors or debt collectors, or the amount that the

consumer would have to accumulate in the Dedicated Account before

Mission would initiate settlement attempts or make a *bona fide* settlement

offer to the consumer's creditors.

29.    Mission's conduct as described above ensured that consumers could not avoid

substantial injury. Mission prevented consumers from learning information that would lead

consumers to decide to forgo participation in the program.

30.    Mission's conduct did not generate any meaningful countervailing benefit to

consumers or to competition.

## LEVITIS'S INVOLVEMENT IN MISSION'S DEBT-RELIEF ACTIVITIES

31.    Levitis managed Mission's day-to-day operations, including activities that form

the basis for this Complaint. Levitis approved the use of marketing materials bearing counterfeit

government seals, demanded regular reports on sales and consumer complaints, directed

employees to provide misleading information to consumers, and determined the outcome of

consumer complaints and refund requests. Accordingly, Levitis engaged in the sale of debt-relief

services provided by Mission.

32.    Levitis also designed and implemented the business model through which Mission

charged advance fees from consumers while often providing consumers little to no debt-relief

services.

33.    Levitis also retained payment processors on Mission's behalf.

34.    Since Mission's inception, Levitis knew that Mission routinely charged fees

before settling consumers' debts and that Mission engaged in unfair and deceptive acts and

practices.

## COUNT ONE (VIOLATIONS OF THE TSR'S ADVANCE-FEE BAN) ASSERTED AGAINST ALL DEFENDANTS

35.     The allegations in paragraphs 1 to 34 are incorporated here by reference.

36.     In the course of telemarketing debt-relief services, the Corporate Defendants requested or received fees from consumers for debt-relief services before renegotiating, settling, reducing, or otherwise altering the terms of at least one of the consumer's debts. The Corporate Defendants requested or received payment of these fees prior to consumers making at least one payment pursuant to any settlement agreement or other valid contractual agreement between consumers and their creditors.

37.     The Corporate Defendants' acts or practices from October 27, 2010 to present violate the TSR, 16 C.F.R. § 310.4(a)(5)(i), and are unlawful acts or practices in telemarketing. Because each Corporate Defendant is a "covered person," each Corporate Defendant's conduct in violation of the TSR is unlawful under sections 1031(a) and 1036(a)(1)(A) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(A). 15 U.S.C. § 6102(c)(2).

38.     Levitis is a "related person" and a "covered person." 12 U.S.C. § 5481(25). He is liable for violating the TSR, 16 C.F.R. § 310.4(a)(5)(i), and sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1).

## COUNT TWO (DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF THE CFPA) ASSERTED AGAINST MISSION AND LEVITIS

39.     The allegations in paragraphs 1-34 are incorporated here by reference.

40.     In numerous instances, in the course of advertising, marketing, promoting, offering for sale, the sale, or the performance of debt-relief services, Mission and Levitis have represented, directly or indirectly, that: Mission's program was affiliated with the government and Mission did not charge advance fees for debt-relief services. Both of these representations

were material, false, and likely to mislead a reasonable consumer at the time they were made.

41.     Therefore, the representations made by Mission and Levitis constitute deceptive acts and practices in violation of section 1036(a)(1)(B) of the CFPA, 12 U.S.C. § 5536(a)(1)(B).

42.     Levitis is a "related person" and a "covered person." 12 U.S.C. § 5481(25). He is liable for the deceptive misrepresentations described above, in violation of sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1).

## COUNT THREE (UNFAIR ACTS AND PRACTICES IN VIOLATION OF THE CFPA) ASSERTED AGAINST MISSION AND LEVITIS

43.     The allegations in paragraphs 1-34 are incorporated here by reference.

44.     Under the CFPA, an act or practice is unfair if it causes or is likely to cause consumers substantial injury which is not reasonably avoidable and if the substantial injury is not outweighed by countervailing benefits to consumers or to competition.

45.     The acts and practices of Mission and Levitis – in particular the acts and practices set out in paragraphs 26 to 34 above – caused consumers substantial injury.

46.     The substantial injury inflicted upon consumers was not reasonably avoidable.

47.     The substantial injury inflicted on consumers was not outweighed by countervailing benefit to consumers or to competition.

48.     Therefore, Mission engaged in unfair acts and practices in violation of sections 1036(a)(1)(B) and 1031(c)(1) of the CFPA. 12 U.S.C. §§ 5536(a)(1)(B) and 5531(c)(1).

49.     Levitis is a "related person" and a "covered person." 12 U.S.C. § 5481(25). He is liable for the unfair acts and practices described above, in violation of sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1).

## COUNT FOUR (DECEPTIVE ACTS AND PRACTICES IN VIOLATION OF THE TSR) ASSERTED AGAINST MISSION AND LEVITIS

50.     The allegations in paragraphs 1-34 are incorporated here by reference.

51.     It is a violation for a debt-relief service provider to fail to disclose before the consumer consents to pay, or to misrepresent in the sale of debt-relief services, the amount of money or percent of debt that the consumer must accumulate before the debt-relief service provider will initiate attempts to settle the debt or before it will make a *bona fide* settlement offer to them. 16 C.F.R. § 310.3(a)(1)(viii)(B), (2)(x). It is also a violation for a debt-relief service provider to fail to disclose before the consumer consents to pay the time by which it will make a *bona fide* settlement offer to the consumer's creditors or debt collectors. 16 C.F.R. § 310.3(a)(1)(viii)(A).

52.     From September 27, 2010 to present, Mission did not disclose either the amounts that must accumulate or the time by which Mission will make a *bona fide* settlement offer, in violation of the TSR.

53.     Because Mission is a "covered person," its conduct in violation of the TSR is unlawful under sections 1031(a) and 1036(a)(1)(A) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(A). 15 U.S.C. § 6102(c)(2).

54.     Levitis is a "related person" and a "covered person." 12 U.S.C. § 5481(25). He is liable for violating sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1).

## DEMAND FOR RELIEF

WHEREFORE, the Bureau requests that the Court:

a.    permanently enjoin Defendants from committing future violations of the CFPA, 12 U.S.C. §§ 5531, 5536, and the TSR, 16 C.F.R. § 310 *et seq.*;

b.    award restitution against Defendants in the amount of all unlawfully collected fees;

c.    order disgorgement of ill-gotten profits against Defendants;

d.    award civil money penalties against Defendants;

e.    award attorneys' fees and costs against Defendants; and

f.    award additional relief as the Court may determine to be just and proper.


Dated:    May 7, 2013        Respectfully submitted,

KENT MARKUS
*Enforcement Director*

ANTHONY ALEXIS
*Deputy Enforcement Director for Field Litigation*

JEFFREY PAUL EHRLICH
*Assistant Litigation Deputy for Field Litigation*

By:   STEFANIE ISSER GOLDBLATT
      J.H. JENNIFER LEE
      *Enforcement Attorneys*
      Consumer Financial Protection Bureau
      1700 G Street, NW
      Washington, DC 20552
      Telephone: (646) 495-5186
      Facsimile: (646) 495-5189
      Email: Stefanie.Goldblatt@cfpb.gov